Sarah Welch, United States Department of Justice QueerDoc doesn't deny that it may have information relevant to an investigation of whether manufacturers and distributors of certain drugs have violated the Food, Drug, and Cosmetics Act, but it has refused to provide that information to the government. In QueerDoc's view, it is immune from federal law enforcement or even investigation because the executive branch has expressed policy opposition to untested gender-related medical interventions for minors, and announced an intent to enforce within that industry laws that protect the public from unsafe medical practices. If QueerDoc were right, decisions quashing administrative subpoenas would be a dime a dozen instead of unprecedented in this circuit, because every administration has law enforcement priorities and every administration has policy priorities. Doesn't the standards that one would have to meet sort of obviate that concern? Your Honor, I think the point I'm making is that it is a heavy burden. That's how this Court has described it. So, I mean, you just said every, you know, every district courts are going to quash every subpoena like this. The standard prevents that, doesn't it? The standard should prevent it, and I think the standard has prevented it until now. The trouble with the district court's reasoning is that it rested on the timeline. It said the President announced this policy view, the Attorney General issued a memo describing ways that the Department of Justice was going to implement policy priorities, including drafting legislation, including launching an investigation into existing violations of the Food, Drug, and Cosmetics Act. The district court then said, therefore, there's an improper purpose here. And that kind of reasoning is what's impossible. Is that finding of improper purpose by the district court a finding of fact? The district court's factual findings are reviewed for clear error. We do think that it was, you can think of it as either legally erroneous or factually erroneous. Our point is that it's a... Why would it be legally erroneous? It's an improper mode of analysis. As a matter of law... But what's improper about the mode of analysis? As a matter of law, it's just not the case that expressing a policy view about an industry or a practice amounts to an improper purpose that could taint an investigation. The district court said, again, the timeline tells the story. But as a matter of law, proximity to expressed policy views simply can't be enough to establish improper purposes. As I understand what the district court did, the district court basically determined that that what was in play here was a desire to eliminate, to get rid of this kind of gender-affirming care that is at the root of the executive orders. Your Honor, we're not denying that the executive branch, the president has expressed that policy priority and has drafted, has ordered agencies to take regulatory and sub-regulatory actions, has ordered drafting of legislation that would accomplish that objective. Is there anything unlawful about what QueerDoc is doing? Your Honor, we have expressed two ways that the two kinds of FDCA violations that are subject of the investigation. What were those? One is manufacturers and distributors engaged in misbranding via off-label promotion. Misbranding here. What's the misbranding that QueerDoc engaged in? Misbranding via off-label promotion is a well-established kind of FDCA violation. Is there anything improper about a doctor prescribing a drug that's been approved for off-drug use? I mean, for off, you know. Well, a drug can't be approved for off-label use by definition, but we've been clear that we're not pursuing QueerDoc or anyone else for the mere act of writing an off-label prescription. We've been clear about that from the district court briefs to our briefs here, and I'm happy to reiterate that again. So you're not after QueerDoc for mislabeling? For the mere act of writing off-label prescriptions. I think we've been clear about that from the start. So what is it? So you just said a minute ago it was mislabeling. So the two theories are manufacturers and distributors engaged in off-label, misbranding via off-label promotion. So off-label prescribing by the doctors, the mere act of writing that prescription is not illegal, but manufacturers are not allowed to introduce into commerce a drug with the intent that it be used for an off-label use. That's prohibited by the FDCA. And so when a manufacturer is engaging in off-label promotion, that expresses its intent for the drugs to move in interstate commerce in violation of the FDCA. That's well established. We point to a number of prosecutions that rely on the same kinds of evidence that we're seeking from QueerDoc on pages seven and eight of our reply brief. That's again, it's a well-established FDCA violation. And we don't, the court doesn't even need to look at our second theory, but the second theory is that QueerDoc itself may be violating the FDCA perhaps by conspiracy to engage in this kind of off-label promotion. Is this the theory that was put out in the Gordas Declaration? That is one of the theories in the Gordas Declaration, yes, your honor. And the district court didn't consider the Gordas Declaration because I think it felt it came in too late. So how do you address that? Sure. So, you know, we can explain without the Gordas Declaration what the relevance of each of the, each of the requests in the subpoena was. So I think it doesn't, it doesn't put us on bad footing before this court. We haven't directly challenged the Rule 7M ruling, but we have argued and continue to maintain that it was improper for the district court to rule against us on a finding of improper purpose without giving us the opportunity to put in our own evidence. And typically the way that's preceded in other cases. Did the court consider the declaration even though it said it was striking it? That's right. The court also considered it in the alternative and made a plainly erroneous finding about the declaration, which was that the assertions about the scope of governmental resources would further undermine, further illustrate improper purposes. This is footnote two. But the district court seemed to think that all of the resources were being employed solely against SquareDoc when that's plainly not the case. And that's nothing that the Gordas Declaration or anyone else has ever said. This is a national investigation into manufacturers and distributors and as well as any violations by providers. So I think, you know, the district court did consider it in the alternative and its consideration was plainly erroneous. I mean, let's just take, assume that what you've said is correct just for purposes of argument. I think, and we're not at this point in the proceedings yet, but there are, you know, you can understand there might be some concerns with some of the requests in particular, the ones that relate to patients and the need for patient records and patient social security numbers and addresses. And so how do you address, you know, the concern that, you know, that is an intrusion on patient privacy or the doctor patient relationship? I'm happy to speak to that in a couple of ways. First, the absolute narrowest point would be that the district court quashed the subpoena as a facial matter without looking to any specific requests. If the court did ultimately get to the point of remanding for further consideration or if the district court or if the court reversed, you know, QueerDoc hasn't engaged in any kind of dialogue with the government trying to narrow requests or perhaps anonymize the materials that it's giving. As to the relevance of those documents to the investigation, one of the ways that the government has proved the principle FDCA theory of manufacturers and distributors violating the FDCA via misbranding the off-label promotion, it's a bit of a mouthful, is through evidence of intent, including manufacturers and distributors advising doctors that they can get insurance coverage if they miscode their diagnoses to hide that they're off-label prescriptions. And so, we would need to match up the way that a particular prescription was billed with what an actual diagnosis for the patient was. I would also emphasize that the HIPAA 3486 specifically contemplates that medical records will be disclosed, provides for immunity from any state law violations that that would otherwise encompass, provides for weighing patient privacy interests in certain circumstances, provides limitations on the way those records can be used. Precedent on this issue, you know, where the government is seeking through an FDCA investigation patient records and courts have had to grapple with whether that request is permissible? I know that's not in front of us now, but the discussion prompts the question. Yes, Your Honor, there is precedent on that. I think we've pointed to a 2000 decision from the Fourth Circuit in Ray's subpoena. That's not a very descriptive name, but it found that all of the doctors' patient records could be subpoenaed and obtained. That wasn't unduly burdensome. That didn't breach patient privacy interests because the government was investigating whether he was billing those treatments falsely. And so, all of the patient records were relevant and could be disclosed. Any suggestion here that ClearDoc is billing patients improperly? ClearDoc provides patients with super bills, so that they provide patients with what are called super bills, so that the patients can submit. It's just a list of the treatments that are being provided in the codes, so that the patient can submit them to the insurer on the patient's behalf. But ClearDoc doesn't do that? ClearDoc has represented that it doesn't directly bill insurance. We're here in a posture where we don't have evidence from ClearDoc itself because it hasn't answered the subpoena. That's something that ClearDoc could disclose. We've requested its billing records. Let me ask you, did you do any kind of preliminary investigation? Your Honor, this is a subpoena issued as part of a broader investigation. The investigation is ongoing. And so, I guess I'm not sure how to answer your question other than that the investigation is ongoing. No, you don't. You can conduct investigations without a subpoena. I think a HIPAA subpoena is the primary tool. If we're not able to use a HIPAA subpoena for this purpose, the primary fallback is a grand jury subpoena.  Let me... I have a few questions for you, and I'm not sure where I want to begin. But Judge Brest was talking about sort of the scope of the subpoena. Let me ask you, can the scope of the subpoena be considered in determining whether or not the subpoena was for an improper purpose? Your Honor, the district court did make that conclusion. The district court's reasoning was entirely based on a misapprehension of what the investigation was. So, the district court completely ignored the possibility that QueerDoc could be a witness to violations by manufacturers and distributors, and the district court thought solely that the subpoena was overbroad to what QueerDoc could be itself doing. It pointed out QueerDoc is not itself a manufacturer or distributor. No one denies that, but that doesn't mean that QueerDoc could not violate the FDCA itself, and doesn't mean that QueerDoc could not be a witness to manufacturer and distributor violations. But my question was, could the breadth of the subpoena be considered in determining whether or not it was issued for an improper purpose? I can imagine a case where that would be suggestive. One case I would point the court to, I believe, is Reich. It's one of the cases that we've cited. The name is escaping me, but it was an IRS subpoena, and the initial subpoena was for six categories of documents, and there was a follow-up subpoena, the recipient refused to answer the subpoena. There was a follow-up subpoena for 17 requests, and they argued that that was evidence of improper purpose because the subpoena got much broader, it would appear to be harassment. The court actually rejected even that argument, even that sort of timeline, as suggestive of improper purpose. So I think to the extent overbreadth is relevant, one, there's no overbreadth here, and two, it would have to be something quite extraordinary, because even that sort of expanding the scope wasn't evidence of overbreadth. So one other question I have for you, and it's this. So as I read the briefs and sort of looked at what was argued in the district court, it struck me that what the argument is, is that, well, the President has issued these executive orders, and we're just, you know, implementing them, and that can't be an improper purpose. I don't, I don't think that's the argument, Your Honor. What is the argument, then? I think the argument is that the government is not required to choose between, between multiple avenues to ensure consumer safety. It can pursue legislation. It can argue to the public that a particular practice or a particular industry is dangerous and unsafe, and it can also enforce existing laws, especially existing consumer protection laws, to protect the public. The argument is that pursuing one doesn't require you to forego the other one, and Queerdoc's argument is, yes, it does. If you have a policy opposition to an industry, then you can't investigate whether laws are being broken within that industry, and that would, that would be astonishing, of course. If a future administration wants to ban sports gambling and also wants to ensure that consumers are being protected by existing sports, sports gambling-related consumer protection statutes, it should be allowed to do so. That's, that's a core prerogative of the executive branch to prioritize its enforcement resources. Did the opposition cite any case where you think that the elimination of gender-affirming care is an improper purpose based on any constitutional basis? No, Your Honor, and in fact, the Supreme Court has said in Scarametti that it is a rational purpose for a government to regulate this, this kind of gender-related medical intervention, including the precise treatments at issue here. But in the, in the, in the states that we're dealing with here, there's nothing improper about the gender-affirming care that, that is taking place here, correct? In the state of Washington, they don't have any laws against it, do they? No, Your Honor, but the federal consumer protection laws do exist, and manufacturers and distributors can't violate them in Washington any more than they can violate them anywhere else. But the state of Washington can't, can't also have its own protective laws as well? The state of Washington can't supersede federal laws. So do you think that's what's going on here? I don't, I don't think so, Your Honor. I don't, I don't think that's what, I don't, I don't think the parties have, have suggested that Washington law would supersede federal law. We would, of course, resist that suggestion, but... Do you think that federal law should supplant the, the, the state law here? To the... Or the, or the President's, or the President's executive orders? To the extent state law is inconsistent with federal law, I think federal law should prevail. Let me ask you, this is an executive order or a federal law? I, I think perhaps for some purposes, perhaps some executive orders. This purpose? I, we're, we're not arguing that it's federal law. We're arguing that the Food, Drug, and Cosmetics Act is federal law that, that heavily regulates the way that manufacturers and distributors can promote their, their products. And that's precisely what we're investigating here. And to the extent that QueerDoc has evidence that it has itself violated the Food, Drug, and Cosmetics Act, perhaps by acting in concert with manufacturers and distributors, breaking federal law, that's what we're investigating. Okay. In your, in your brief, you made comment that there was some suspicious activity, you talk about conspiracy to violate the law, in the, in QueerDoc saying to its customers, we'll send you the medicine under the name endocrine disorder rather than gender affirming policy of care. And also that if you don't want to use your real name, we'll send you the medicine to another name. Is that the type of thing which you think is a possibility of evidence of conspiracy to misbrand? It could be evidence of intent to conceal. It could be evidence of different violations. You know, insurance billing fraud is, is a common form of healthcare fraud. So the, the, the reason that we're investigating QueerDoc, a perfectly sufficient reason is the Gordas Declaration refers to whistleblower complaints and, and expert evidence of that, that manufacturers may be engaged in misbranding via off-label promotion in this space regarding these drugs. And QueerDoc is a provider in that space. It's extremely common in FDCA investigations to obtain evidence, not just from the manufacturers and distributors, but also from other, other people in the industry. Doctors often have evidence of, of this kind of off-label promotion because it's often directed at doctors or, or, or, you know, telemedicine clinics. I'll, I'll reserve the rest of my time. We'll put three minutes when you come up and let's hear from Ms. Raymer. Ms. Raymer, good morning. Good morning. Good morning, and may it please the court, Paula Raymer, counsel for Apelli QueerDoc. In June 2025, the Department of Justice issued 20 identical subpoenas to providers of gender affirming care. These subpoenas were issued as part of the administration's larger effort to end gender affirming care. Is that an improper motive for the executive to end gender affirming care? So your honor, the executive issued an executive order stating that they wanted to quote, end gender affirming care, calling it a stain on the nation's history. That in and of itself is not improper. Not an improper motive, right? Certainly. The administration can have that as a policy goal and can take steps to achieve that policy goal. Explain to me why if subordinates read that and take action, which will help the president's goal, their action is illegal. So your honor, I don't think that's what we're arguing. I think what we're arguing is that what happened in the wake of that executive order was that the Department of Justice issued subpoenas under the guise of conducting an investigation under the Federal Food, Drug, and Cosmetic Act. So you're claiming that these subpoenas are pretextual? Yes, I am. Yes. Because the subpoenas were, sorry, as I was saying, gender affirming care is medical care that is legal. Congress has not legislated against it. It's lawful in 23 states and the practice of medicine is expressly left to the states for it to regulate. As the district court here found, this is not a case where you need to speculate about hidden motives because the government has made its improper purpose clear in several ways. But tell me why the subpoenas are pretextual if, as Ms. Welsh indicates, they're seeking evidence of possible conspiracy for misbranding. So Your Honor, that has not been the government's theory throughout this investigation. Well, it was the theory as I heard it this morning. So Your Honor, the government is now in its appellate briefs focusing on the idea that QueerDoc may simply be a witness that has documents or information relevant. Better late than never, right? Certainly Your Honor. But I think that it's shifting explanations of what it is investigating here are the evidence of improper purpose that we're arguing justify quashing the subpoena. So when this investigation first began, counsel reached out to the Department of Justice and asked what this investigation was about. The Department of Justice attorney said that it was about conducting an investigation into gender affirming care. They cited the memorandum issued by Attorney General Bondi and they said they were conducting an investigation under the Food, Drug, and Cosmetic Act. When we filed our motion to quash and the government responded, the government offered little in the way of an explanation to justify the investigation, but certainly did not suggest in that brief that they were conducting an investigation related to manufacturers. It was only after courts in the District of Massachusetts and a different court in the Western District of Washington had quashed the subpoenas issued to Boston Children's Hospital and Seattle Children's Hospital that the government filed the Gordist Declaration, which for the first time attempted to articulate a theory of FDCA liability. But Your Honor, even in the Gordist Declaration, the focus is clearly on the actions of QueerDoc, not on the fact that it is a potentially a witness to misbranding that may have taken place by a manufacturer. You know, there's some maybe new stuff in the Gordist Declaration. It seemed that the district court did understand this to be, at least initially, an investigation relating to manufacturers and the argument was, well, QueerDoc is not a manufacturer, so that's one reason why maybe it's improper to subpoena QueerDoc's records. Do you agree with that characterization or do you see it a little differently? I don't agree with that. I think that in the Gordist Declaration, the focus is on a couple of different things. One, Mr. Gordist argues that QueerDoc itself could be liable under the FDCA for prescribing drugs off-label. I'm glad the government now recognizes that is not the case, but that was the position they took in the Gordist Declaration. And at that point, Mr. Gordist also took the position that a statement on QueerDoc's website could be considered misbranding because it suggests that puberty blockers are reversible. And so I think that the Gordist Declaration really, although it certainly references prosecutions of manufacturers, to the extent it was putting forth new facts and new legal arguments, those seem to be almost entirely focused on conduct that would have taken place by QueerDoc, not manufacturers. So in addition, so going back to the statements this administration has made with respect to its desire to end gender-affirming care. So first, as we've said, the president issued an executive order stating that gender-affirming care is a stain on the nation's history that, quote, must end. The attorney general echoed that in a memo she issued in April. And in fact, after issuing the subpoenas to the 20 providers, the attorney general herself issued a press release in what is a really radical departure from typical DOJ precedent and announced the investigation herself, stating that they had issued these subpoenas to hold providers, quote, accountable for providing this care. The press release did not say we're seeking to hold them accountable under the FDCA because we think they may have misbranded or we think that maybe they're in communication with manufacturers who are misbranding. What the press release said is we're seeking to hold them accountable for providing this care. Yeah, I guess the question it raises is, you know, what relevance does it have to the to the request for documents of an entity that has some relationship to an asserted investigation? You know, what do we make of statements? And we see this in other cases, too, where someone's pointing to a particular statement made by a government official and saying, well, that that shows that the whole thing is pretextual or based on some kind of animus. How do you how do you respond to the argument on the other side that, you know, that that really shouldn't be considered, at least in terms of whether this is an improper subpoena? So Your Honor, I think it should be considered because there are cases that hold that public statements made by the government can be considered for the purposes of improper purpose. And I think here the evidence is so clear and so overwhelming what the administration's goals were and are with respect to its desire to end gender affirming care. And again, as we've said, we don't disagree with the government that the president can certainly have a policy agenda and that they can take steps to carry out that policy agenda. What they can't do is issue a subpoena and use an unrelated investigatory tool in an effort to end that care, something for which Congress has not legislated against. And again, which is legal in twenty three states. So how I mean, the the I think the government would say, well, look, the subpoena doesn't end the care. The subpoena is trying to get documents and we haven't gotten to the point of figuring out, you know, whether any of these requests may be excessive and anyone who serves a subpoena never gets everything they're asking for, as we all know, as lawyers. So with all that in mind, you know, why is the issue here just not really one about the scope of the subpoena? And that's where this should the fight should be. So your honor, two responses to that, first, with respect to the scope of the subpoena, the scope of the subpoena is incredibly broad. I would note that the same subpoena was issued to all 20 providers, meaning that a small telehealth provider like Queer Doc got the same subpoena that the biggest children's hospitals received. I think that in of itself is evidence of improper purpose. The requests are not tailored to the individual recipient of the subpoena, nor frankly, are they tailored to the scope for the government has said this investigation is about. There are many, many requests that have nothing to do with the Food, Drug and Cosmetic Act. In fact, I would argue that none of the requests actually relate to the FDCA. And I think you can bring that up if this case is remanded to the district court on the grounds that the scope is overbroad and it's burdensome. But those that was not the basis upon which the district court made a facial quashing of the subpoenas. Is it correct? Well, your honor, the scope of the subpoena is, again, evidence of the improper purpose and the reason about improper purpose. Are you relying on the Powell case as far as improper purpose? Correct. All right. The improper purpose has been used in IRS situations where the IRS uses a civil summons to get evidence in it for a criminal proceeding. That's an improper purpose because it violates the constitutional protections against self-incrimination. They've been used also where the request for documents is for a private purpose to benefit a friend of a senator, for instance. And they've also been found to be subpoenas that are based on improperly produced evidence, surveillance evidence, et cetera. But those are the only areas where the Powell decisions have been made. They've been very restrictive as to the question of improper purpose. And if the president and the administration's purpose to end gender-affirming care is not itself improper, it's not violating Glucksberg, for instance, what's the basis of saying that it's an improper purpose? So, Your Honor, the fact that the administration is seeking to end gender-affirming care, again, we don't disagree with the fact that they can have it as a policy priority. What we're disagreeing with is how they're seeking to carry that out. And part of the way they are seeking to carry that out is by issuing 20 subpoenas to providers of gender-affirming care and then announcing its own investigation into those providers. And the collective effect is this interim effect of everybody understanding that to provide gender-affirming care in this environment means that you are under the threat of criminal prosecution. It's part of the larger campaign, but it's an improper use of the subpoena power. So do you think the subpoena would be appropriate as to other actors in, let's just call it the supply chain, you know, other drug company or distributor? So Your Honor, I can't speak to what other actors may, you know, may do if they had received such a subpoena. Well, I guess I'm more maybe asking it a different way, which is did the pretext arguments kind of extend to everybody or are they more limited to a certain class of recipients? So, Your Honor, I think the pretextual arguments go beyond kind of the class of the subpoena recipient, but I do think they are particularly strong with respect to the providers because the providers, again, the link between the government stated investigatory purpose under the FDCA just bears no relevance to a provider. That is not what the FDCA does. The FDCA doesn't govern the practice of medicine. It doesn't govern how providers treat patients, their clinical decision-making, their prescribing. That's just not what the FDCA is about. The FDCA is a federal statute that governs the distribution of drugs in interstate commerce. I guess one question is, you know, how much do we get into sort of the merits of the FDCA claims at this stage or are those something that's more properly dealt with later if your client finds itself actually the subject of an investigation? So Your Honor, I think that's relevant only to the extent that it shows that we don't, that Congress did not, that, sorry, DOJ did not have the authority to issue the subpoena under an FDCA theory because it's such a weak link and frankly a nonexistent link to any conduct that might have taken place by a provider. So I don't think you need to get into the merits of the FDCA argument. And it isn't conceivable that your client is involved in any misbranding? So Your Honor, it is not conceivable that any of the, that the actions that QueerDoc itself has taken would constitute misbranding. I don't think the government has alleged that and I... And it's inconceivable that QueerDoc is conspiring with any manufacturers to cause misbranding? So Your Honor, first of all, this investigation is purely about the Food, Drug, and Cosmetic Act. It is not, as I think the government may have suggested, an investigation to broader health care fraud or anything along those lines. And I recognize that in order to show a conspiracy claim, they would need to show an underlying violation of the FDCA and I don't think that is even a question here. I'm sorry, was the rest of your question? That there is no violation or that that's not what they're looking for? Explain that.  I mean, both. I think that there's no link between the actions of a provider in this case and what the Food, Drug, and Cosmetic Act is supposed to regulate here, nor is there any suggestion of any conspiracy under that predicate statute. Could you just elaborate on the supposed link with the FDCA? Sure. You mean why the FDCA is really a misfit here with the sector providers? Yes. Sure. So, first of all, as I've said, the FDCA regulates the distribution of drugs in interstate commerce. It doesn't regulate how doctors diagnose or treat patients. The statement on QueerDoc's website that the government has highlighted isn't labeling under the FDCA. It doesn't accompany a drug. It is not part of an integrated distribution program. It's merely informing patients or potential patients about particular drugs that are used in gender-affirming care. Second, the FDCA doesn't prohibit the truthful, non-misleading, and accurate description of clinically appropriate off-label uses. That is protected by the First Amendment, as the Supreme Court, numerous other courts, the FDA, and others have all recognized. Are these arguments that should be entertained now in the context of a dispute over documents, or are they arguments for later if your client is pursued by the government? Again, Your Honor, I don't think you need to entertain these arguments now. Our position is only that the lack of a link between the FDCA and a provider is really just further evidence of the improper purpose because it shows that the idea that the government is conducting an investigation under the FDCA is really pretextual. What are factors that you think courts should consider in doing the pretext analysis? Because I think the government wants to say, listen, some of the statements by higher-level policy officials, even the President, those really shouldn't be considered. What do you think is the universe of evidence that goes into this? So Your Honor, I mean, I can't speak to every case, but I would say here it is the clear and direct and repeated statements that have been made by this administration about its desire to end gender-affirming care. I would say it's also the scope of the subpoena, the lack of a link to the FDCA, and the fact that it has issued subpoenas to 20 providers. And again, the collective effect of that shows that it is part of this broader campaign to end gender-affirming care, which again, it cannot do by subpoena. It could certainly try to enact legislation. It could take other steps. But what it can't do is try to end a legal practice of medicine by issuing subpoenas to providers in the hopes that it scares them and others into stopping that care. You mentioned, or somebody mentioned, we're aware that there's other cases out there. So do you know the status of those in terms of other courts of appeal? I do. So there are, as far as we know, there have been seven challenges to these subpoenas, including ours. Of those seven, all seven courts have found in favor of the providers and have either quashed or limited the subpoenas that were issued to them. Four of those cases are now up on appeal in the first, third, and fourth circuits in addition to ours. Two of them are not yet up on appeal because there are still issues being dealt with in the district court. But the key point there is that no court to date has found the government's arguments as to the basis for its subpoena to be legitimate. How many of these have relied on the same grounds the district court did, with essentially pretext purpose? I believe all of them. And then what's the status specifically, do you know, in the first, third, and fourth? Are they being argued, briefed? No, Your Honor, the government moved to expedite this case. So we're the first up on appeal. The remainder are all on a slower schedule. So my understanding is that briefs, I think, in the first and third circuit are due within the next couple of weeks. Okay, that's helpful. Have any recipients of the subpoena complied? So Your Honor, that's not public information. I mean, we know that 20 subpoenas were issued. We know of the seven that have challenged because those cases have been public. I think it's hard to know kind of what other recipients may have chosen to do in response to the subpoena. Okay. Is there anything in the record that shows that providers of gender affirming care, when the subpoenas were, after the subpoenas were issued, said, look, we just don't want anything to do with this anymore? Yes, Your Honor. Is there anything in the record about that? In the record, yes, Your Honor, there is. So in the record, we've pointed to press releases issued by the White House in the wake of the executive order and in the wake of these subpoenas, a large number of hospitals that provide gender affirming care have stopped their programs. And the White House itself has issued a press release in which it actually took credit for that fact and said that the fact that these hospitals have decided to stop providing this care is, quote, the intended effect of their efforts of the administration's efforts to end this care. Yeah. Did any of these hospitals ascribe their stopping of gender affirming care to the fact that they received investigative subpoenas? Your Honor, I don't believe any of them have explicitly said that. Well, if there's no more questions. Okay. I'm sorry. There is one. Sorry. Thank you. There is one hospital that has expressly said that it is ending the care because it received a subpoena. Sorry about that. Okay. Thank you for the clarification. And thank you very much for your presentation. Thank you. Please address the claim of pretext. Sure, Your Honor. I'm happy to start there. I'll start with the press release about hospitals ceasing to provide gender-related medical interventions. In that press release, there's no link whatsoever to subpoenas. I'm not familiar with the hospital press release the opposing counsel was referring to. It's certainly not in the record in this case. But the administration has not linked, you know, hospitals ceasing to provide gender-related medical interventions with issuance of subpoenas. There's certainly nothing in the record to that effect. There is no doubt that this investigation is actually happening. Judge Bea, other subpoena recipients have answered subpoenas. We have hundreds of thousands of pages of documents that we've received as a result of the subpoenas. The investigation is ongoing. We are investigating, as the Bondi memo and the Shoemate memo say, not just FDCA violations but also False Claims Act potential violations. These subpoenas are specific to FDCA violations. That's why we've explained the FDCA theories that we're investigating, the potential violations that we're investigating. And so there's just undoubtedly a genuine investigation that is genuinely happening. And charges will be filed if there's... Cameron, counsel said that over time, as this process got underway, that your characterization of what you were investigating has changed. How do you respond to that? Thank you, Your Honor. That was on my list of things to respond to. I would point, Your Honor, to page 16 of our reply brief, where we walk through how consistent the representations have been throughout, from the Bondi memo, to the Shoemate memo, to our briefs below, to the court's declaration, to our briefs on appeal. We have consistently given the same explanations for the core of what we are investigating, which is FDCA violations by manufacturers and distributors engaged in misbranding via off-label promotion of the two classes of drugs. In the district court, did you characterize Queerdoc as a potential witness to these alleged or possible misdeeds by manufacturers? We explained both that it could be a potential FDCA violator itself, and that it could be a witness to potential FDCA violations by manufacturers and distributors. Also as to the opposing counsel suggested that the Gordas Declaration suggested that providers could be liable specifically for writing off-label prescriptions, I just wanted to point the court to ER 65 footnote 1, where he specifically says the opposite of that. So I just wanted to point out that inaccuracy about the record. As to patient records, Judge Brass, you had asked if there are other cases addressing this. I wanted to point you to page 15 of our reply brief, where we cite both the Fourth Circuit case I mentioned, as well as a case from the Sixth Circuit called Doe that also addresses patient records under HIPAA subpoenas. In a similar vein, the breadth of a subpoena, the permissible breadth, is measured by the needs of the investigation rather than specific relevance to a possible element of an FDCA violation. This court's precedents have been extremely clear on that. Golden Valley, FedEx are the two that I would point the court to in particular on that. The last point, Judge Brass, you asked how much the court should get into the merits of potential FDCA violations at this stage. For two reasons, I think the court should not delve deeply into that well. One is that the court did not raise its sort of extensive, elaborate FDCA theories as a reason that there was no legitimate investigation below in the district court. So those aren't preserved, as we explain in our briefs. And second, the standard is extremely high. There must be plainly lacking authority by the agency to investigate. And we have an undoubtedly valid FDCA theory that Queerdoc still has not questioned. And whether specific facts would constitute FDCA violations or certainly whether particular applications of the FDCA could possibly violate the First Amendment are just far outside the scope of what should be happening in a summary proceeding of this nature. The last point, if I could just wrap up, is that I think it's extremely telling that Queerdoc can't even agree that manufacturers and distributors could receive subpoenas. Their theory of pretext is so broad that they couldn't even agree that a manufacturer or distributor of the drugs of interest could receive a subpoena that would be valid. That sets up precisely the dichotomy that just can't be right, that the administration must choose between advocating for a policy outcome and using tools like regulatory actions and proposing legislation to achieve that outcome, on the one hand, and enforcing existing laws to protect consumers within the same space, excuse me, where it's engaging in policy advocacy. So we ask that the Court reverse. Thank you. Thank you, Ms. Welch. Thank you, Ms. Ramers. Thank you. Thank you to both of your teams. This matter is submitted. That concludes our calendar for the week. I want to take the opportunity to thank Ms. Hubbard for her service this week and to the rest of the staff here at the Nakamura Courthouse for the excellent service you've provided. And that concludes our calendar, and we stand adjourned. All rise.
judges: PAEZ, BEA, BRESS